The first matter is Charatz v. Avaya. I see we have a delegation from the West Coast here this afternoon. You do, Your Honor. My name is Sandy Svetkov from the Coghlan-Stoya firm in San Francisco with me at the council table are Peter Pearlman, our co-counsel from New Jersey, and Art Leahy, our chief trial counsel. I'd like to reserve three minutes for rebuttal if I may. Thank you, Your Honor. The appellants are five union and city municipal pension funds. They appeal the dismissal of their first consolidated security fraud complaint. Your Honor, we have several submissions. First, we think the district court got it wrong under Tellabs and this court's decision in Weiner in failing to take into account all of the allegations in the collective analysis. We think the Safe Harbor ruling is wrong under this court's decision in Echocat because the Berardi is continuing assurances that the company gave over the class period and the on-track statements are actionable in context. For 40 years as a corporate defense lawyer and as a prosecutor, I've heard this court admonish plaintiff civil lawyers to take into account context. Well, the plaintiffs are here to tell you in context the on-track statements are actionable. We have briefed the leave to amend issue, but I'm going to leave that for the briefs unless the court has questions. We think the Berardi decision controls there because the judge found futility without any briefing from the other side. We asked for leave to amend. The judge had no basis for understanding what we would or how we would amend the case. And we've suggested certain ways of doing so in our briefs. Well, let me start with Scienter. I guess the predicate would be, Your Honor, that the court found that we pled the where and why with particularity. The judge found that we described our confidential witnesses with a sufficient basis of knowledge. But did you link the information from the confidential witnesses to the two major defendants here? No, we didn't, Judge Sirica. Directly in a word-to-word conversation, but indirectly. How? Statements made by Mr. McGuire after the class period. So when the witnesses said the company was giving discounts to CW4, a manager who was there throughout the class period, they were giving 20% discounts to 80% of the customers before they were only giving them to 20% of the customers. And the discounts went up as the class period went on to 30-40%. And what does Mr. McGuire say after the class period? Oh yeah, I heard that noise in the first quarter. Now I got that wrong in my opening brief, but not in the reply brief. The first quarter is October, November, December. The first three months of the class period. I heard that noise about the 30-40% discounts. What shows that he knew that at the time he made the statements, though, as opposed to learning it after the April 19th conference call? That's a great question, Your Honor. Inference does. Inference does. The witnesses were there, said it was happening at that time. He was the one talking about it. He was the one who said, we're not giving discounts. Yes, there's lots of competition in the marketplace, but we're not giving discounts. The witnesses are saying they were giving discounts. They described the customers, the major customers who were getting the discounts. And then, and then, Your Honor, the Lehman Brothers analyst report in March said from the beginning of March, they've been giving discounts at all of their midline products, 150 to 400 lines. That's confirmed by CW6, who said that that's what was happening during the March period. Now, if things were happening after the fact, this court's decision in Merck, the Second Circuit's decision in Scholastic, the Fifth Circuit's decision in Plotkin by Judge Jones, who's not going to give the courthouse away to the plaintiffs, all say, look, if something is happening six weeks after the fact, it's reasonable to believe it was happening back then. McGuire is the chief financial officer. He's speaking about these issues. He's speaking about these issues. He is denying discounts up until April 19th. We pointed out to Your Honor that although it's not in the complaint, it is in the documents that the defendant submitted. On April 19th, Mr. McGuire continued to deny discounts. I think it's on page 472 of the record. Yes, it is, of the appendix. Nine days later, he suddenly hears the noise. Now, it's not credible. And those kinds of fact determinations are for resolution by a jury. The inferences, when you put them together, are the witnesses say it's happening, Lehman Brothers says it's happening, McGuire admits it's happening, McGuire's talking about this subject. Now, you put all that together, and that's what didn't happen. First of all, Judge Cooper never even mentioned the Lehman Report. In fact, she said, how can I believe the Lehman Report in the transcript, not in the order? On page 206 and 207 of the appendix, how can I believe it? We don't know how Lehman Brothers got their information, but we do know how Lehman Brothers got the information. They tell us in the report, they spoke to Avaya's resellers and distributors, and who else would know about this phenomenon? So McGuire knew by inference, there's no direct evidence, Your Honor, we don't have to have direct evidence. But if you put the witnesses, Lehman Brothers, and McGuire's statements together, over the period of time, and the fact that he's talking about it, I don't know, I think the inference is cogent, I think it's compelling, it's certainly as compelling as the opposite inference that he did, Your Honor. How does the Supreme Court's decision in Tel-Avvs affect your case? Well, it's kind of neutral, but it clears up a couple of things. First of all, our opponent said we had to have a case that was more plausible than the defense case. We now know that draws and ties go to the plaintiff, which is what I argued to the Ninth Circuit in physics and got turned down. But now we know ties go to the plaintiff, and that's as it should be. Ties go to the plaintiff on summary judgment. I think there's a consistency in the way that analysis works. And in terms of weighing competing inferences, this court's done that in all of its cases. And Judge Cooper, the problem with Judge Cooper's decision is she didn't weigh all the evidence. She didn't consider the Lehman Report. She mentioned the witnesses, said they spoke with personal knowledge, but then never applied their analysis. So I think there's reversible error in the fact that she failed to follow the collective analysis of Tel-Avvs. Now, Judge Cooper thought we were only relying on the so-called core business inference. How does that play here? The analyst described the core story for Avaya as its operating margin story, that they could continue to sell their products at the high prices to make the profit. But if they were discounting and cutting their prices, it would cut into their profit. And that's exactly what happened here. Instead of an 8 or 9 percent operating margin at the end of the class period, they announced a woeful 4.3 percent, 50 percent of what they projected. Their earnings were down 60 percent. They missed their revenues by $100 million. That's huge. The magnitude of the miss, Judge Fischer, is a part of the analysis. How could they have missed all of this? And remember, McGuire made another admission, again, not in our complaint, but in the record supplied by our opponents. McGuire admits, I think it's 474 of the appendix, that when he was asked by an analyst, what did you see early in the quarter? And he said in January and February, he saw flat or lower earnings than the quarter before. So, and he never said anything about that to the public. He knew in January and February that things were not going well. But flat and lower than the quarter before, the first quarter was flat too. At page 4, 38 and 39 of the record, although they had a 6.5 percent growth rate, that was way below what they were hoping for. Remember, they had increased their projection from 25 to 27 percent to 28 percent. So, 6.5 or flat with 6.5 is way below what they were hoping for. If you put all those facts together, Judge Fischer, that's a cogent inference of Sietra here. Now, let's talk about how that plays into the safe harbor. If they know they're giving discounts and they know that their sales are slipping, they know they're not going to make their numbers, yet they say, we're on track to make our numbers. We feel comfortable increasing our revenue projection from 25 to 27 to 28. Well, your position is that that's a statement of present fact. Partly present, partly future. Well, and... Judge Zareka, it's a fair response, I think. Good. So how do we chop that in half? You chop it in the following way. Judge Posner explained it in the second round of the tele-apps case. We're still going strong means. Today, currently, our business is doing just fine, and that gives us hope. And, in fact, you should count on the fact that we're going to make those numbers we told you about. You know, Judge Alito, in the Burlington case, said that when a company expresses comfort with a projection, that endorses it and it's actionable. I don't think you can slice comfortable and on track and still going strong. They're all the same message. Today, we're fine. Tomorrow, we're going to be fine. The tomorrow part is future. Actual knowledge is pled here. The safe harbor... You cannot have a meaningful safe harbor warning that we may have problems when you already know you're having those problems. It's not a meaningful warning. In Advanta, I think the court said actual knowledge alone would knock out the safe harbor. Here we have actual knowledge and no meaningful warnings because diluted by these countervailing assurances. Do we read the statute in the disjunctive here? You read it in the disjunctive. The C.B. on case, which we cited in our reply brief, explains it. Yes, it's in the disjunctive. But if the warning is substantive and tailored, but there's actual knowledge that the may part of it has already manifested itself, then no warning can be meaningful unless you say, we're lying. So you've got to be disjunctive with some degree of reason. We're going to give you some more time. Most of the courts that have looked at the language of the statute have disagreed with that reading. Is that right? The Ninth Circuit has said actual knowledge alone defeats the safe harbor. I understand. This court in Advanta didn't have a warning, but there's actual knowledge. We just had one inquiry in Advanta, so we didn't need to address that issue. But I think whether it's disjunctive or not, the only rational way to read disjunctive is, if you have actual knowledge, you cannot have a meaningful warning unless the warning is, it's happening now, which is an admission of fraud. And anything short of that, that we may cut prices, or we may not do as well as we can, is not a meaningful warning in that context. There's that horrible word context. Put on ten minutes, please. Thank you. No, no, we're going to give you some more time. Oh, okay. Well, perhaps we should talk about this leave to amend business. Well, let's go back. Let's make sure we understand. What about the cautionary language? I mean, there was cautionary language. There was cautionary language. There was competition from Cisco. And if that competition is tough enough, it could hurt our ability to profit. And there was even a warning in one of the ten cues that said we may, we may cut prices. We may cut prices. Well, may cut prices doesn't cut it when you're already cutting prices. And when McGuire says that he knew about price cutting back in the first quarter, October, November, December, to say during the class period that we may cut prices doesn't work if you're already cutting prices. So I don't see how there's a meaningful. It's tailored, but not meaningful. It's tailored, but not meaningful because it's diluted by we're on track. We are increasing our warnings. We're not giving discounts. What is the safe harbor? It's a measurement of whether you can say as a matter of law that the caution, the warnings given by the company render the statements, the false statements immaterial. No reasonable investor should rely on statements that have been warned away in that fashion. Well, they weren't warned away, but when you have a tribal issue, a fact as to whether they're meaningful, you get past the motion to dismiss. That's the teaching of Echocat. The continuing assurances outweigh, or at least put in tension, whether the warnings are meaningful. And, you know, Judge Easterbrook in Asher versus Baxter, which we cite in the briefs, said one of the most telling comments about the materiality of the warning, the sufficiency or the meaningfulness of the warnings, is what happens when the market learned the truth? When the market learned the truth, the stock price went down 25%. So, and I'll tell you the best evidence here that these warnings didn't work was the Citigroup... the Citigroup analyst report. After Buckingham on March 3rd said, you know, their sales are starting to slip, and Lehman came out on March 21st with, you know, they're giving all these 30, 40% aggressive, unusual discounts. Their sales are starting to slip. So Citigroup comes out and says, yeah, we've heard that, but they just raised their, their revenue out forecast from 25% to 28%. They wouldn't have done that if there was any real concern. So the analysts were misled. The analysts didn't get the meaningfulness of the warnings. And then a short time later, the truth comes out. So, Your Honor, this case ought to be sent back and reversed. The question I thought you were going to ask me is, you know, did you call these statements that are in the record but not in your complaint to Judge Cooper's attention? I have to say we did not. And your courts would tell you that. But I don't want to leave without addressing that. This is the no-rule review. And tell Ads and Winder if they teach anything is that we're not limited to the complaint anymore. Judicial notice and incorporation account. And whether the documents come from us or from the defense, they're fair game for the court. And they're fair game for this court. So we have two theories about those documents. One, either they count now in this complaint or we get to amend those on remand if we get leave to amend. Judicial economy says do it now. Consider them now. Give us an up or down on this complaint. And we say give us an up. Why don't you spend a minute on the amendment then? You didn't give much to the district court in terms of on amendment. Here's what happened. Normally you would give a new complaint. In the district court the defendant's motion said dismiss with prejudice but never argue for futility. We said in our complaint, citing Burlington, if you find any defects, give us a chance to amend. End of submission. Argument hearing goes forward. The issues are dealt with on the merits. No discussion of leave to amend. No concern about leave to amend by anybody. The first time we hear about leave to amend is in the footnote on the last page of the order of the district court. I find futility. They plead everything they could plead. He had no way of knowing that. You could have gone back to the judge after the entry of judgment on a Rule 59 motion. Judge, Rule 59 is we're rowing upstream. Up here we get a level playing field. Tactically, I don't think we have to row upstream on this record. The judge did what this court said in Berardi v. Swanson Lodge. He should not do. Finding futility without briefing from the defendant. That's reversible error unless you call us back in and say how can you amend? Judge Cooper never did that. I think the fair shake here is give us an up or down on the complaint and we say up or give us leave to amend. We would narrow the complaint as we described in our opening brief. It's not that we don't think the Tenova's integration had something to do with what went wrong with this company. We just didn't plead it with enough particularity. We accept that. We took out the puffery statements on appeal. We narrowed our complaint to what it would be like if we went back to the district court. What would you add to your complaint? We would add those statements that I mentioned to you that were in the defense documents that we didn't have in the complaint. There are three of them, Your Honor. The one about McGuire saying on the 19th that he saw in January and February lower or flat sales to the prior quarter. And as I mentioned the prior quarter was flat 6.5%. Well you can't project 28% if you're only seeing flat 6.5%. And just too far of this. The other statement is that Mr. McGuire admitted on the 19th of April that he bragged that there were no discounts and then nine days later he had to un-brag it. He had to say oh yeah I heard that noise 30 to 40% in the first quarter, only one product. Well you don't have to it's a classic half truth. Yes there were discounts but only a little bit and it wasn't unusual. His own resellers are saying it was aggressive unusual. Lehman is saying it's aggressive unusual. Buckingham is saying it's hurting sales. The witnesses are saying that. There's just too much to put together here to say this is not a cogent and compelling case as compelling as the opposing inference. It's there. You haven't argued anything about the motive allegations. I haven't. Are you dropping those? I'm not. Judge Fischer, frosting on the cake is the best metaphor I can give you here. Both Peterson and McGuire sold stock. They sold in substantial amounts. 2%. $5.5 million nicely timed after each of these groups of false statements came into play. With respect to McGuire, he sold all 97% of the stock he actually held. Forgetting about options. They always get the options. The options were a big piece. Whatever he held in hand, he sold 97% of it. As compared to the prior six-month period, he only sold 40,000 shares. 40,000 versus 600% difference. It's not enough standing alone. I'm not here to say that. We didn't say that to the judge. Judge Cooper said in her order that we didn't rely on insider trading to support Sientra. That's not quite right. We didn't rely on it to support a strong inference alone. We couldn't. It's not believable. Who would believe that? But it lends coherence to the other facts when you put them all together. And we get to add it all together. Each individual inference need not be strong. The totality must be strong. That's the teaching of tele-apps. Good. Anything for me? Mr. Fedko, thank you very much. We'll have you back on rebuttal. Mr. Schatz? Good afternoon, Your Honor. May it please the Court Stephen Schatz on behalf of Appalese. Respectfully, this is a case that should never have been brought. It's nothing more than a missed forecast case. In October 2004, Bavia told the market about its goals for fiscal year. Excuse me, I'm sorry. Michael, put 25 minutes on here. In October 2004, Bavia told the market about its goals for fiscal year 2005, which ended in September 2005. In January, it announced Q1 results, which actually were better than analysts' estimates. But at the same time, Bavia cautioned the market that domestic revenues were flat and that they were flat in part to the implementation of the go-to-market program. In April, after a disappointing Q2, five and a half months early because Bavia never gave a quarterly forecast. So five and a half months early, Bavia recalibrated the market based on the results in Q2. Now, you would not know that from the plaintiff's submission that the revenue for Bavia grew by approximately a billion dollars in the year in question. Nor would you know that EPS grew by seven cents. Nor would you know that Bavia consistently punctuated its public pronouncements with meaningful cautionary statements about the very issues that they say were concealed. So we talked about intense competition. We talked about Cisco being as strong as ever. We talked about how in January and in March, how the implementation of the go-to-market program has impacted the company. Respectfully, we believe that this case would not have passed muster under the traditional jurisprudence of this court with respect to the Reform Act under cases like Chubb, Alfama and Advanter. But after Telabs and Weiner Family Trust, we think that's even more clear. And we think that this court should affirm the district court's careful decision below just as another panel of this court affirmed the companion ERISA case which was filed based on the same stock drop price and that's the Edgar v. Avaya case that was recently decided by this court. Now the district judge obviously didn't have the benefit of Telabs here or any decision from our court but did the district judge really look at this holistically as the Supreme Court has asked? I think the judge found two things. First, the judge found that they had not alleged falsity and I'll discuss that but we believe that that's clearly correct. She did not look at it from a global perspective but we encourage this court to do so because we think when you do, there's really only one inference and that inference is a benign inference. So if we could just focus on the complaint the gravamen of the initial complaint was somehow that Avaya misled the public about the Tonovas acquisition. They no longer challenge that. So what they now have left are statements about concerning our annual projections and that we were on track to meet our annual projections I'll call those the forecast allegations and then statements relating to price pressure and competition. As I indicated as you go through the facts here Avaya was very very careful to track where it was at any given point in time and let me just point to two statements that are in the record because when it comes to the issue of competition Mr. Svetkov says well Mr. Maguire denied that there was price cutting. We punctuated all our public statements about competition we never said that there was no price cutting. We said it was a competitive market. We said it was not materially different during one period versus another. So let me direct the court if I could to appendix page 535 This is Mr. Maguire I fully expect that others, other competitors will become more competitive as they work through some of the issues they had and I clearly expect to see Cisco still strong as we've seen. Cisco is a mega company. It's the force in the industry. With respect to the issue of competition Mr. Peterson says appendix page 411 I'd say pricing as a general comment is not different from what it has been and here's the follow up there continues to be pressure in the market it's a very competitive marketplace. So he's created a red herring that doesn't exist. What about the on track statements? Weren't the statements made to analysts and publicly as well that the company was on track for the projections for profitability and doesn't that have both a present and a future component? Well actually your honor we believe that the on track under the reform act actually is forward looking as the court will note that the definition of a forward looking statement includes the assumptions as well as statements relating to the forward looking information but in any event they don't even come close to suggesting that we weren't on track when you look at the record Well that's a different issue but first how are we to treat that statement we're on track to prior projections apparently the 7th circuit um in the teleps case said that sales are still going strong refers to the present not to future or maybe both the present and future so at least is there not a present component in a statement that we're on track to meet I believe that because you don't know the accuracy until a subsequent event under Harris V.I. Vance which is the 11th circuit case it should be the better rationale is that it's a under the concept of forward looking doesn't it say something about where you are at the present time it does and if you let's focus on when those statements were made the first statement was made in mid January in the middle of the first month of the second quarter McGuire had just had a successful Q1 which exceeded analysts expectations so they have no evidence that that wasn't the case and with respect to March and again we Mr. Speckroth omits the second half of Mr. McGuire's statement he did say that January and February tracked slightly out or slightly behind the prior quarter but the outlook looked good for March closure and that certain transactions that were expected weren't consummated and that the distributors didn't reload as they expected in light of that I think that they haven't come close to proven falsity so we think first it's forward looking second we think it's the kind of soft statement of optimism that courts all the time deem to be not actionable and that's particularly true here because remember we're not talking about a quarterly forecast we're talking about an annual forecast a forecast that even in January many many months away and the market tends to discount longer term statements like that so it would be quite different if he said this quarter is tracking well but he's talking about the annual forecast just step away from the mic just a little bit because we listen to the tapes again Mr. Schatz you discount the allegations as to motive but don't particularly since Teleps don't the allegations about the motives have some relevancy certainly to the C enter question and I think they are absolutely helpful here with respect to Mr. Peterson he sold 2% of his stock in the during the class period as compared to 4% in the comparable period the year before hardly an inference that he's somehow dumping all his stock McGuire sold the same percentage 18% in both instances they had 10B51 plans in place which are periodic programs of sales so that there can be no inferences drawn and I think that they're consistent with motive under those circumstances so you disagree with the mathematical calculations council for the plaintiff gave us on 600% as to the actual held shares absolutely because the law is clear one case but there are numerous cases that say that you have to take into account vested options and I think that as an economic and rational matter that makes sense what are we to make of the fact that it seems that all the analysts up to a certain point and some of the investment houses as well were taking at face value what your client was saying yet it turns out that the facts were differently at least something happened to cause the projections to change the whole premise of when Congress passed the safe harbor this is an awful tricky microphone the whole premise of the safe harbor was to encourage companies to provide forward looking information to the market necessarily when you give forward looking information unless you are totally clairvoyant there is a risk that your statements are not going to come to pass and Congress said we have made the judgment that we want to encourage companies to make those forward looking statements when coupled with cautionary statements because we think on balance the market is going to be better off necessarily we had a disappointing quarter but the question is was it fraud and we believe when you look at all the inferences they are benign we made our January numbers they rely on their confidential witnesses to somehow try to show that there was unusual discounting but you know from the record here that there wasn't unusual discounting on appendix page 284 you will see as part of our financial statements for the first two quarters of fiscal year 2005 and if you do the math you will find that our gross margins were 46% guess what for the comparable period the year before our gross margins were 46% and if there had been aberrational discounting unusual discounting it would have appeared in the gross margin so all they have and they don't have much is they have three mid to low level confidential witnesses who only see a little slice of this mega company one of those confidential witnesses left the company seven months before the class period another worked for the company for one month in the class period and even with respect to confidential witness number four his assignment is special bids for for service not for service contracts no perception of how much was involved no perception of whether the forecast took that into account or whether there was offsetting issues of mix and the like and one thing does tell you Judge Fischer is that omissions and ambiguities do cut against the plaintiffs if they had it they should have alleged that they didn't and finally with respect to the judge your honor I think it's very simple when analysts follow a company and they have a disappointing quarter they're not happy and they rarely get against the companies they've but that doesn't mean that the projection was wrong and they have to allege facts that create a strong inference a strong inference that the company didn't believe its forecast and when you layer on top that it made Q1 when you layer on top that their margins that their margins remain constant constant which is where you see the discount we think there's only the cogent compelling inference is exactly what Mr. McGuire did say in April that it was a disappointing quarter because certain transactions didn't close at the end of the quarter that resellers didn't restock and because we had additional costs with respect to the transaction which allegations they no longer challenge so when you do take the holistic approach you say to yourself okay they've dropped the allegations of the most significant events in the quarter the costs associated with the turnover's transaction which the company clearly said was a cause for the miss they with respect to the concept of unusual discounts you know that's not the case because of the gross margin issue but in any event they only had a few isolated CW's an enormous company I think it was in GSC Partners where there was an issue about whether the certain debt would be recoverable and there was a memo that said something like 3.8% to 10% was not likelihood of recovery was slim and the court correctly perceived that that's just a small slice of the company here you have even a smaller slice here someone who's in charge of special bids for service contracts so I think I've addressed the issue of falsity we don't think that they come even close to this we believe the cogent compelling compelling inference is that is a benign one the quarter just turned out to be disappointing because certain transactions were consummated and finally the statements virtually all the statements we think are forward looking and protected by the safe harbor and if I could address the issue of the of whether the statute is disjunctive or not the four courts of appeals that have adjudicated the issue have clearly have decided that it's in the disjunctive Mr. Spetkov misspoke when he said the 9th Circuit resolved it that was a district court decision I think in the central district Advanta had his statement in isolation that the statement was made with actual knowledge it would not be protected and it was correct in that context because the statement that was being challenged was one by someone by the name of Pointer at a Dow Jones Dow Jones interview and there were no cautionary statements that had been made so of course at that point the thing that you had to rely on was the actual knowledge we think GSC partners if anything implicitly implicitly adopts the disjunctive because it talks about whether collection is probable and they talk about actual knowledge and then they go on to say in any event they gave warnings so we think you could be GSC partners to have already so ruled but in any event we think the clear and unmistakable best reading of that statute as required by the legislative intent which we set forth in our brief in page 58 makes clear that it should be the disjunctive. What about the dismissal with prejudice? We believe that the that dismissal with prejudice was entirely appropriate here. First of all there had been five complaints and lead council had the benefit of looking at all five complaints. There was then a six month hiatus at which time they could investigate investigate their claims and draw a complaint they never bothered to tender an amended a complaint even though it's required by the local rules and as Judge Roth's decision in the Lake case and the Lund case we think that the failure to proffer a proposed amendment is sufficient in of itself. Will the appellants now say that if they had an amended complaint there are three statements they would add? In your view would that be sufficient? In my view each of those statements don't alter the equation at all. Mr. McGuire's statement please omits the second half of that statement says that we were tracking in January and February slightly behind the first two quarters but the outlook looked good for a March close with respect to his April 28th statement I think Judge Fisher's comment was completely on point. There's no suggestion that he knew about it at the time and about the discount in that mid-range program but most significantly we never said that there was no discounting. We always said it was a competitive marketplace they had to show aberrational discounting and you know that isn't the case because of the gross margin issue and when you look at these issues basically the CWs don't even remotely suggest what Mr. McGuire or Mr. Peterson knew. They never had any contact. They don't know what documents they had and Mr. McGuire's statements when viewed in context we believe are benign. We think the far more compelling inference is that is the one that I've repeated on several occasions namely that because of the cost associated with the Tanovish transaction and because certain sales did not come in and certain resellers didn't restock as anticipated they were surprised at the end of the quarter and therefore they had a disappointing quarter and they recalibrated the market for the year. Any other questions? Mr. Schatz thank you very much. Thank you. Mr. Speckoff. With respect to my friend when Mr. McGuire said I saw the January and February lower than the quarter before and the quarter before was flat. He said well I'm still hopeful for March for this quarter. Well this quarter came in at 7 cents and they projected 17 cents but how does that excuse not coming in for the year which they projected because on April 19th they say the company believes it will not meet its previously stated goals for growing revenue, operating income and operating margin for fiscal 2005. They didn't just miss the quarter they missed the whole year and how does he get around that one? That's the problem in the case. If he wants to save a little piece of March with a self serving statement made on April 19th another one of McGuire's half truths he admits January and February and tries to salvage something in March it doesn't work if you blow your whole year after that how does he explain that one? Let's talk about this I'm going to hit a few little points the disjunctive. The statute says meaningful warning or actual knowledge but it can't logically mean be read in the conjunctive it's written in the conjunctive my point is it can't logically be understood in the conjunctive it's sort of like that other part of the rule about stating all facts which this court disposed of can't mean all facts well this can't mean when there's actual knowledge you can't excuse any warning as meaningful once you have actual knowledge unless the warning is we lied and that's not what their submission is so it can't be understood in the subjunctive in the disjunctive let's start with the beginning of the half truths in this case Mr. Schatz keeps saying we admit there was competition we admit there was competition that's the true part the false part is there's no price change he said it as late as look at what he said on page 472 there is no specific discounting policy we put in place I can tell you our discounts were relatively black or improved in most of the world hello 9 days later he says oh yeah I heard that noise about 30-40% discounts in the first quarter 6 months earlier it's not believable it's not believable that's why I keep coming back to the Teleps holistic analysis if you put the analysts the resellers the witnesses and Mr. McGuire's half truths together you get a cogent fraud case here that's our submission and Judge Cooper and I think I misspoke in saying he and she it's she you got it right most of the time I got it right most of the time also Mr. Schatz is wrong there is a 9th circuit case that addresses this disjunctive point I think it's America West I think I said it on another point in the reply brief but I think the 9th circuit there suggested that once you have actual knowledge it's not possible to have meaningful warnings thank you the case was very well argued we'd like to have a transcript made of the oral argument and for the parties to share it so if you would check with the clerk's office as you leave they will tell you how to do that we thank the lawyers very much we will take the matter under advisement